PATRICK BAILS,                        )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      No. 04 C 4649
                                      )
BLUE CROSS/BLUE SHIELD OF             )
ILLINOIS, a division of Health        )
Care Service Corporation, a           )
Mutual Legal Reserve Company,         )
and UNITED AIRLINES EMPLOYEE          )
WELFARE BENEFIT PLAN,                 )
                                      )
            Defendants.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Patrick Bails complains that defendant United
Airlines Employees Welfare Benefit Plan (the "Plan") denied
medical benefits for two of his children.[1]  Also named as a
defendant is Blue Cross and Blue Shield of Illinois which

---

[1] The two children, Michael and Emily Bails, are also
named as plaintiffs. Since they are minors, they cannot
bring claims in their own name. Their claims would have to
be brought by their father as their guardian or next friend.
But even that is unnecessary since Patrick can bring all the
claims as the plan participant. Michael and Emily will be
dismissed from this action without prejudice.

provides administrative services for the Plan, including claims administration. Both sides have moved for summary judgment.

It is undisputed that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., applies to the Plan and that the Plan provides that the Plan Administrator has discretion to make determinations regarding Plan benefits. The parties agree that the benefits determinations at issue are subject to arbitrary and capricious review. Arbitrary and capricious review is, of course, a deferential standard of review. Under the arbitrary and capricious standard, a plan administrator's decision should not be overturned "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." Sisto v. Ameritech Sickness & Accident Disability Benefit Plan, 429 F.3d 698, 700 (7th Cir. 2005) (quoting Houston v. Provident Life & Accident Insurance Co., 390 F.3d 990, 995 (7th Cir. 2004) (quoting Hess v. Hartford Life & Accident Insurance Co., 274 F.3d 456, 461 (7th Cir. 2001))). Nevertheless, "[d]eferential review is not no review," and "deference need not be abject." Gallo v. Amoco Corp., 102 F.3d 918, 922 (7th Cir. 1996), cert. denied, 521 U.S. 1129

(1997); Berg v. BCS Financial Corp., 2006 WL 273541 *2 (N.D. Ill.
Feb. 2, 2006). In some cases, the plain language or structure of
the plan or simple common sense will require the court to
pronounce an administrator's determination arbitrary and
capricious. Hess, 274 F.3d at 461; Gallo, 102 F.3d at 922. The
decision of the administrator will not be upheld where there is
an absence of reasoning supporting the determination. Herman v.
Central States, Southeast & Southwest Areas Pension Fund, 423
F.3d 684, 693 (7th Cir. 2005); Hackett v. Xerox Corp. Long-Term
Disability Income Plan, 315 F.3d 771, 774-75 (7th Cir. 2003).
The administrator "must articulate a rational connection between
the facts found, the issue to be decided, and the choice made."
Dabertin v. HCR Manor Care, Inc., 373 F.3d 822, 828 (7th Cir.
2004); Speciale v. Blue Cross & Blue Shield Association, 425
F. Supp. 2d 917, 928 (N.D. Ill. 2006). Also, a determination may
be arbitrary and capricious where the administrator has
disregarded the submissions of the claimant. Hess, 274 F.3d at
463. "When challenged in court, the plan administrator can
defend his interpretation with any arguments that bear upon its
rationality. He cannot augment the administrative record with
new facts bearing upon the application for benefits . . ., but he
is not limited to repeating what he told the applicant." Gallo,
102 F.3d at 923. Accord Militello v. Central States, Southeast &
Southwest Areas Pension Fund, 360 F.3d 681, 691 n. 12 (7th Cir.),

- 3 -

cert. denied, 543 U.S. 869 (2004); Berg, 2006 WL 273541 at *2;
Bahnaman, 219 F. Supp. 2d at 925.

Under arbitrary and capricious review, review of a plan's
decision is generally limited to evidence or information that was
before the reviewing body. Vallone v. CNA Financial Corp.,
375 F.3d 623, 629 (7th Cir.), cert. denied, 543 U.S. 1021 (2004);
Hess, 274 F.3d at 462; Perlman v. Swiss Bank Corp. Comprehensive
Disability Protection Plan, 195 F.3d 975, 982 (7th Cir. 1999);
Bahnaman v. Lucent Technologies, Inc., 219 F. Supp. 2d 921, 925
(N.D. Ill. 2002). Although the parties' cross motions are for
summary judgment, actually before the court is administrative
review of the benefits decisions with the administrative records
being the essential uncontested fact.

Patrick Bails is a participant in the Plan. His children
Michael and Emily are beneficiaries of the Plan. The aspect of
the Plan at issue is the 2003 Revision to the United Airlines
Medical and Dental Plan (the "Medical Plan"). In dispute is
whether speech therapy for the two children is covered by the
Plan. Michael was born in October 1993. He has been diagnosed
with autism and has been receiving speech therapy since at least
1998. Emily was born in April 1996. She has suffered from
speech problems since she was 18 months old, and has been
receiving speech therapy since she was two years old. Before
2004, the Plan had paid for the speech therapy. Since early

- 4 -

2004, the Plan has denied such coverage and the denials were
upheld in administrative appeals.

In a letter dated February 16, 2004, Blue Cross denied
coverage for Michael's speech therapy. Michael's mother
requested the "clinical rationale." Blue Cross responded in a
letter dated March 18, 2004. That letter essentially repeated
the reasons stated in the February 16 letter. The denial was
appealed and a March 16, 2004 "follow-up evaluation report" from
a treating physician was submitted. In a letter dated April 8,
2004, coverage was again denied. The stated reason was:

> There is no evidence that speech therapy is
> likely to restore this member's lost function in
> a reasonable and predictable period of time. The
> child has autism with severe chronic problems in
> communication. He has had years of speech
> therapy with limited progress in treatment. His
> progress in treatment is unpredictable because of
> his diagnosis of autism (also severe apraxia and
> static encephalopathy),[2] and because his problems
> are severe and chronic.

On further appeal, the review was conducted by another
"physician who specializes in Psychiatry." The denial of speech

---

[2]Blue Cross's Medical Policy Guidelines define Apraxia
as: "A disorder resulting from cortical damage, affecting the
ability to voluntarily control motor programming. There is no
associated weakness." Medical Policy THE803.014 (March 1, 2000)
(reproduced as Def. Exh. 4, Tab 2 at 249). Encephalopathy is
"any disorder of the brain." Stedman's Medical Dictionary (27th
ed.) available at http://www.stedmans.com/section.cfm/45.

- 5 -

therapy services was again upheld. The reasons stated in the

April 29, 2004 denial letter were:

> This patient is a ten year old boy diagnosed
> with static encephalopathy (autism). He has been
> receiving speech and language services from the
> speech therapist since January 1998. He is not
> enrolled in a school setting. The patient is
> currently being seen six times a week in speech
> therapy for 45 minutes at a time. In a recent
> evaluation, dated 3/16/04, and in a telephone
> discussion with Dr. Greenspan on 4/28/04, he
> indicated that he anticipated the boy will
> require such ongoing services for the next 10-20
> years. The boy is indicated to have been making
> progress in speech therapy, but 10-20 years is
> not a reasonable period of time and continued
> improvement cannot truly be predicted.
>
> The Health Plan SPD [Summary Plan
> Description] indicates coverage to be available
> for speech therapy if it is of a rehabilitative
> nature and excludes such services from coverage
> if they are in the nature of education, training
> or maintenance care. The speech problem dealt
> with here is not restoration of a previously
> present and now lost or impaired [capacity]; this
> is not rehabilitative in nature. It is cognitive
> and training in nature and is being done in lieu
> of a school placement. Given the concept that
> such treatment should go on for 10-20 years, it
> may well be considered maintenance in nature as
> well.

Medical services that are not "Medically Necessary" are

excluded from coverage. Medical Plan § 8.1(A)(5). Medically

Necessary services must "in the determination of the Plan

Administrator or its delegate" be "appropriate and required for

the diagnosis or treatment of the patient's condition" and be

"safe and effective in curing or materially alleviating the

patient's Sickness or Injury according to accepted clinical
evidence . . . ."  Id. § 1.3, *Medically Necessary* (A)(1)-(2).
The Medical Plan defines Medically Necessary as excluding
"Educational" services, id. § 1.3, *Medically Necessary* (A)(5),
and also expressly excludes coverage for both Educational
services and "Maintenance Care," id. § 8.1(A)(7)

        The Medical Plan defines "Educational" and "Maintenance
Care" as follows:

> "Educational" means that the service is one
> that does not diagnose or treat a Sickness or
> Injury, but is intended to teach the patient or
> patient's family or care giver about the
> patient's condition, about the treatment or
> prevention of a Sickness or Injury or about
> healthful practices and habits.
>         "Maintenance Care" means any treatment or
> course of treatment that, in the determination of
> the Claims Administrator, does not have a
> reasonable expectation of significantly improving
> the patient's condition.

Id. § 1.3.

        The Medical Plan excludes coverage:

> for speech therapy that does not actively treat a
> speech impairment resulting from disease, trauma,
> congenital anomaly or previous therapeutic
> process, or treats a swallowing disorder, non-
> restorative conditions such as developmental
> delays, or that is not likely to result in a
> significant improvement of the condition being
> treated.

Id. § 8.1(a)(21).

- 7 -

Blue Cross's Medical Policy Guidelines provide:

Speech Therapy services **are eligible for coverage** when all of the following criteria are met:
o    Used in treatment of communication impairment or swallowing disorders due to disease, trauma, congenital anomalies, or prior therapeutic intervention
o    Prescribed by a licensed physician and rendered by a licensed or otherwise certified Speech Therapist
o    Used to achieve a specific diagnosis-related goal for a patient who has a likely expectation of achieving measurable improvement in a predictable period of time

Medical Policy THE803.014 (March 1, 2000) (reproduced as Def. Exh. 4, Tab 2 at 247).

Defendants denied benefits for Michael on the ground that the speech therapy he is receiving is Educational. Alternatively, benefits were denied because the speech therapy constitutes Maintenance Care. Plaintiff contends these grounds for denial are arbitrary and capricious. He contends that it is irrelevant that Michael does not attend school because the term Educational has a particular meaning under the Medical Plan. It refers to educating a patient or his caregiver about the patient's condition, or the treatment or prevention of the condition. Plaintiff contends Michael's speech therapy is treatment, not education about his condition. As to Maintenance Care, plaintiff contends that the treatment does not qualify as

maintenance care because the record supports that Michael has a reasonable expectation of improvement.

In a letter dated January 22, 2004 (Def. Exh. 4, Tab 2 at 183), Michael's speech therapist (Michele Ricamato) stated that she is the only "professional" in his life that is trained to use the augmentive device that enables him to be understood. She stated further, "Michael is not in a school program and therefore all of his academic work is integrated into speech and language sessions using his augmentive device. Communication and comprehension for academics are integral parts of the sessions with written and oral communication and comprehension a large focus of activities." Defendants point to this statement as showing that Michael's speech therapy is educational. Defs. Brief at 14 (citing Fact Statement ¶ 31). The decision on the final administrative appeal mentioned that Michael was not in a school and that his speech training was in lieu of a school placement as showing that the speech training was excluded as Educational.

The Educational exclusion is limited to teaching related to the beneficiary's injury or illness. It is not, as the Plan Administrator's delegate assumed, equivalent to educational in the traditional sense of primary schooling. After this point was raised by plaintiff in his answer brief, defendants contended in their reply that: "It was not arbitrary for Blue Cross to

- 9 -

conclude that the speech therapies were designed to teach Michael about his condition and about healthful practices and habits concerning his speech." Defs. Reply Br. at 6. Since raised for the first time in the reply, it is questionable whether this assertion should even be considered. But even if considered, it is without merit.

Defendants point to no evidence supporting that Michael's speech training included teaching him or his family about healthful practices and habits. Even if it could be assumed without any supporting evidence that some of Michael's speech therapy included such instruction, that would, at most, support denying coverage for an allocated portion of the expense. Defendants do not attempt to disallow only a portion and point to no basis in the record for making any such apportionment. Because it is inconsistent with any reasonable interpretation of the plain language of the Medical Plan, a denial of benefits for Michael based on the Educational services exclusion is arbitrary and capricious. Cozzie v. Metropolitan Life Insurance Co., 140 F.3d 1104, 1109 (7th Cir. 1998); Speciale, 425 F. Supp. 2d at 924; Clarke ex rel. Estate of Pickard v. Ford Motor Co., 343 F. Supp. 2d 714, 720 (E.D. Wis. 2004).

The decision regarding coverage for Michael's speech therapy cannot be overturned unless the alternative explanation based on the Maintenance Care exclusion is also arbitrary and capricious. The final administrative determination made

reference to Maintenance Care and, on summary judgment,

defendants expressly rely on the Maintenance Care exclusion.

Therefore, the denial must be consistent with a reasonable

construction of the Medical Plan's Maintenance exclusion.   That

term is defined solely in terms of whether a treatment is

expected to improve a patient's condition.   The issue concerning

Maintenance Care is whether the record supports the conclusion

that speech therapy "does not have a reasonable expectation of

significantly improving the patient's condition."

Defendants base their application of the Maintenance Care

exclusion on a statement from a treating physician that Michael

would require 10 to 20 more years of speech therapy.   The

reviewing psychiatrist who took the statement from Michael's

treating physician summarized the statement as follows:

> Telephone discussion with Dr. Greenspan occurred
> on 4/28/2004.   Dr. Greenspan indicates that the
> patient had essentially normal development until
> about age 2 when he had language in the form of
> words and phrases and then regressed as is the
> usual pattern in the autism spectrum disorders.
> He states that the boy is currently being seen 6
> times weekly in speech therapy for 45 minutes at
> a time and has made progress.   He is now able to
> use words and phrases again.   Dr. Greenspan feels
> that further improvement is likely over a time
> frame of the next 10 to 20 years and would want
> the treatment to proceed for that duration of
> time.

Polsky Peer Review Report at 2 (April 29, 2004) (reproduced as

Def. Exh. 4, Tab 2 at 205).

Defendants applied the exclusion because they considered a 10-to-20-year course of treatment to be too long a period of time to support a reasonable expectation of significant improvement. They also rely on the Policy Guidelines for speech therapy which require that there be "a likely expectation of achieving measurable improvement in a predictable period of time." While the language of the exclusion and Guidelines is open to interpretation regarding particular periods of time, it is reasonable to interpret them as excluding from coverage a treatment that would require at least 10 years, and possible 20 years, to produce significant improvements. Plaintiff apparently does not disagree with such an interpretation of the Medical Plan's language. Plaintiff, though, contends that the evidence does not support the conclusion that there was not a reasonable expectation of improvement. Plaintiff contends that the reviewing psychiatrist (and defendants) rely on the remark of Dr. Greenspan regarding how long Michael's treatment might be, but ignore other evidence in the record that the treatment was resulting in significant improvement. Plaintiff points to various reports and letters from Michael's treating physicians and speech therapist.

A March 15, 2001 Progress Report from Ricamato (Michael's speech therapist) sets future goals and also describes progress from the prior six months. She states that "[o]verall, Michael

has made substantial progress," including that "Michael's
receptive language and auditory processing have continued to
increase significantly," he "continued to make excellent progress
in th[e] area" of "receptive communication," and "Michael's play
skills continue to develop." Ricamato Progress Report (March 15,
2001) (reproduced as Def. Exh. 4, Tab 2 at 149-50). The report
is not limited to these conclusory statements; it also contains
detailed descriptions of the progress that had been made.
Ricamato's January 22, 2004 Progress Report also sets forth a
plan for continued improvement as well as reporting "excellent
progress over the past five months." Ricamato Progress Report
Jan. 22, 2004) (reproduced as Def. Exh. 4, Tab 2 at 153). This
included details supporting that "Michael's receptive language
and auditory processing have continued to increase within the
past five months." Id. at 152. As to Phonological/Speech
Production, "Michael continues to use a wide range of appropriate
sounds, but his ability to process those sounds is compromised.
As his ideation and sentence length has increased, his ability to
understand has become more compromised. . . . He has made good
progress in this area." Id. at 153. Again, the report details
the progress that has been made and the treatment goals show the
progress that is expected in the future.

        Dr. John Hicks is a physician who has been seeing Michael
since at least early 2000. He was involved in prescribing and

supervising the speech therapy. In a brief letter dated
January 22, 2004, he states in part: "Decreasing [speech and
language] services will likely result in a loss of current skill
level and a failure to progress further. Michael has made good
and consistent progress under the direction of his present speech
and language pathologist, Michele Ricamato, M.A. CCC-SLP, and it
is essential that he continue his therapeutic work with her."
Hicks Letter (Jan. 22, 2004) (reproduced as Def. Exh. 4, Tab 2
at 179).

Dr. Stanley Greenspan is a psychiatrist who has treated
Michael. In a brief letter dated January 22, 2004, he states in
part:

> An appropriate treatment program must include the
> following:
>
> 1. Intensive Individual speech and language
> therapy with a speech pathologist a minimum
> of six sessions weekly.
>
> Without the above described speech and language
> program, Michael's prognosis for continued
> improvement is threatened. He is likely to stop
> making progress and may regress to earlier
> patterns.

Greenspan Letter (Jan. 22, 2004) (reproduced as Def. Exh. 4,
Tab 2 at 181).

Also in the record, is a March 16, 2004 Follow-Up
Evaluation Report from Dr. Greenspan. Unlike his January 2004
letter, this Report provides some detail as to Michael's

- 14 -

diagnosis, progress, and treatment plan. The Report is based on

a "follow-up visit" Michael had with Dr. Greenspan. The Report

provides in part:

> . . . [Michael] presents with some real and
> nice gains in some areas, but also shows that
> other areas need work. Michael does have the
> potential for significant gains in all areas.
> At present, the areas of best gains are
> in his ability to relate with real warmth and
> pleasure. He can not just look at another
> person, but can engage with great intimacy,
> happiness, and joy and can really light up. . . .
> However, Michael can't sustain the two-way
> communication for a long enough period of time to
> effectively problem-solve or regulate
> himself. . . .
> Michael can also sequence and problem-solve,
> but also needs to work on more of a continuous
> pattern of shared social problem-solving . . .
> He can use simple ideas and engage in simple
> pretend sequences, but here, too, needs more of a
> continuous flow of back-and-forth exchanges. He
> is beginning to learn to connect ideas together
> logically and can make substantial progress in
> this area with practice at both the basic level
> of interacting with gestures as well as with
> words.
> Therefore, we have to help Michael become a
> better two-way communicator. . . . In fact, it's
> important to emphasize that Michael is fully
> capable of doing this and of making substantial
> progress.
> Contributing to Michael's challenges are
> auditory processing and language problems,
> sensory modulation difficulties, motor planning
> and sequencing problems, and to a lesser extent,
> visual-spatial processing challenges. He is,
> however, making progress in all these areas of
> processing information.
> From a diagnostic point of view, Michael
> evidences a form of static encephalopathy (ICD-9
> 742.9) with speech and language, motor, sensory,
> and affective dysfunction. This static
> encephalopathy, as are most, is due to

unspecified causes, but suggests an impairment in
central nervous system functioning that is not
progressive and is responsive to continuing
progress and functional improvement in core areas
of functioning, such as cognitive, language,
social, and emotional areas, with a proper
intervention program.
    Michael's improvements should continue for
the next 20 years, as we now have mounting
evidence that appropriate and comprehensive
intervention programs for children with the form
of static encephalopathy evidenced by Michael can
help them make progress well into the adult
years.  These functional improvements have the
potential to be substantial and improve Michael's
capacities significantly. . . .
    [Michael]'s prognosis is best described by
his learning curve over the next few months and
years with an appropriate intervention program.
As that curve continues on an upward trend, his
prognosis for continued improvement remains very
good.

> [Treatment Plan Omitted]

    In summary, Michael requires a comprehensive
program involving professional therapies--speech
and occupational therapies, a home program, and
an educational program, at this time carried out
at home.  With such a program, the prognosis for
continuing improvement in core functional
capacities, including the capacities to relate,
communicate, and think, as well as capacities for
self-care and mastering certain fundamentals of
academics, is quite good.  Without such a
program there's a high likelihood that this child
will not be able to improve and will regress and
lose current capacities.
    I recommend that the family return in three
to six months about for a follow-up evaluation
and to check on Michael's progress.

Greenspan Follow-Up Evaluation Report (March 16, 2004)

(reproduced as Def. Exh. 4, Tab 2 at 242-44).

It is true that Dr. Greenspan projects improvements that will continue for up to 20 years. However, he also reports significant improvements that were occurring in 2004 and could be expected to continue to occur in the near future. He recommends another appointment within three to six months so that he can check on the continuing progress. The March 2004 Report also contains a detailed treatment plan. Consistent with Dr. Greenspan's Report, the speech therapist's January 2004 Report details both the improvements that Michael had made in the prior five months and a treatment plan for the following months that was expected to continue to improve Michael's condition. While it may be that Michael will continue in treatment for another 10 to 20 years and that the pace of continued progress might eventually slow to a marginal amount, the medical records that were before defendants only support that measurable improvements were still occurring as of the April 2004 determination date.

The Medical Plan defines Maintenance Care solely on the criterion of there being "a reasonable expectation of significantly improving the patient's condition." As to speech therapy specifically, the Medical Policy Guidelines state that criterion as "a likely expectation of achieving measurable improvement in a predictable period of time." The Medical Plan does not require that there be an expectation of complete recovery or full function within a short period of time; it only

requires an expectation of significant, measurable improvement in the short-term. The medical records that were before defendants only support that, as of Spring 2004, there was still a likely expectation of measurable improvements in Michael's condition. Therefore, it was an abuse of the discretion permitted by the Plan for defendants to deny coverage for Michael's speech therapy based on the Maintenance Care exclusion.[3]

Since both of the grounds relied upon as being a sufficient basis for denying coverage are arbitrary and capricious, defendants will be ordered to provide coverage for Michael's speech therapy from the date it was previously denied, February 16, 2004.

After allowing $2,000 for Emily's speech therapy services performed in early 2004, defendants reviewed whether plaintiff

---

[3]The April 29, 2004 denial letter also makes reference to the speech therapy not being rehabilitative in nature because it was not designed to restore a capacity that Michael previously had, but lost or was impaired. In reciting the facts, defendants recite the claims decisions' references to rehabilitation. In reciting facts, defendants also quote the language of the Medical Plan's Speech Therapy exclusion: "treats a swallowing disorder, non-restorative conditions such as developmental delay." Defendants, however, argue only that Michael's therapy is not covered based on the Educational and Maintenance Care exclusions. They make no argument based on the ambiguous non-restorative or developmental delay language. Speech therapy may be for a communication impairment caused by disease or congenital anomalies. There is no contention that Michael's communication impairment is not caused by disease or congenital anomalies. In any event, since defendants present no argument based on Michael's condition purportedly being non-restorative in nature, that issue need not be considered.

should receive benefits for Emily's speech therapy services
performed March 1, 2004 or thereafter.  It is undisputed that
this was considered to be a review to assess the "medical
necessity" of the services.  When no clinical information was
received, a denial letter dated April 9, 2004 was sent out.  The
stated reason for the denial was:  "A request was made to the
provider for clinical information.  At the time of the review, no
clinical information had been received to justify the need for
the service."  Determination Letter (April 9, 2004) (reproduced
as Def. Exh. 4, Tab 3 at 290).

        In early May, Emily's speech therapist and treating
physician submitted information in support of the claim.  Dr. Kim
Forsey-Koukol, apparently Emily's pediatrician, provided a letter
that reads in its entirety:

            Our patient, Emily Bails, BD 04/29/96, has
            Apraxia of Speech.  Due to medical necessity, it
            is my opinion that she continue her speech and
            language therapy with her current Speech and
            Language Pathologist, Michele Ricamato, M.A. CCC.
            Emily has previously been treated by other
            pathologists and school districts but has shown
            the most improvement with Michele.  Thank you for
            your consideration in this matter.

Forsey-Koukol Letter (May 11, 2004) (reproduced as Def. Exh. 4,
Tab 3 at 283).

        On May 6 or 11, Ricamato faxed a more detailed
description of the services she was providing to Emily.  She
explained that she had treated Emily from September 1998 to

- 19 -

October 1999 and from May 2003 until the time of the fax, and that another therapist had treated her during the interim. She listed Emily's initial evaluation as Apraxia of speech. Ricamato expressly states: "No injuries are being treated. No injuries have been identified or sustained." As of September 1998, Emily had a "limited word repertoire, difficult in the sequencing and production of sounds and oral motor dysfunction. Her comprehension was adequate . . . but her . . . speech production was impaired significantly." Ricamato listed the frequency and type of treatments Emily had received and recommended that she continue to have two visits per week for the next six months. As to Emily's progress to date, Ricamato stated:

> Emily responded well to treatment. Apraxia hinges on the child's ability to imitate and sequence sounds. Emily responded well to oral motor exercises that stimulated her ability to imitate sounds. Emily has made significant progress throughout the course of treatment. She has gone from a limited amount of words that were difficult to discern to almost age level expressive language and continuing difficulties in speech production and intelligibility.

Ricamato lists three long-term goals: (1) improve motor functioning; (2) improve sound production for connected speech; and (3) improve sequencing of words for connected speech and language. As to each long-term goal, she lists three or four short-term goals. Ricamato Fax (May 2004) (reproduced as Def. Exh. 4, Tab 3 at 280-81).

Defendants again denied benefits stating: "Based upon the clinical information submitted, the treatment/care required is not eligible for benefits. Speech therapy rendered for the treatment of psychosocial speech delay, behavioral problems, attention disorder, conceptual handicap or mental retardation is an exclusion under the member's health benefit plan." Determination Letter (May 19, 2004) (reproduced as Def. Exh. 4, Tab 3 at 292). Defendants also point to the "Case Event Summary" which apparently contains the notes of the Blue Cross employee conducting the inquiry. Those notes indicate an inquiry was made regarding the cause of Emily's apraxia and there was no diagnosis of it being caused by disease, trauma, or a congenital anomaly. See Case Event Summary (reproduced as Def. Exh. 4, Tab 3 at 397-99). The entry regarding the May 19 determination also contains the following: "Note: If diagnosis for the etiology of the language disorder can be given that falls under a congenital problem then based on the progress noted the service would be a covered benefit." Id. at 399.

Ricamato appealed the May 19 determination. No additional materials were provided, but a physician specializing in internal medicine and not previously involved in the denial reviewed the file. Coverage was again denied. The determination stated:

Reason: The information submitted for appeal was reviewed by BCBSIL Appeals Medical Director. The information is not sufficient to establish medical necessity for the service. It consists of letters from the member's physician and from her speech and language therapist.

BCBSIL Medical Directory suggests that the following information would be helpful, and when it is received the appeals file can be reopened: speech therapy session notes and evaluation/re-evaluation reports for the past 3 to 6 months. Also, any medical information about any medical conditions that may have caused or contributed to the member's speech apraxia or speech delay. Records may be submitted to: . . . .

Determination Letter (July 19, 2004) (reproduced as Def. Exh. 4, Tab 3 at 294). No further materials were thereafter submitted.

The Medical Plan defines "Medically Necessary" as follows:

"Medically Necessary" means that the services or supplies are, in the determination of the Plan Administrator or its delegate:
(1) appropriate and required for the diagnosis or treatment of the patient's condition;
(2) safe and effective in curing or materially alleviating the patient's Sickness or Injury according to accepted clinical evidence reported by generally recognized medical professionals or publications or provided in a clinically controlled research setting . . .;
(3) required for reasons other than the convenience of the patient, Licensed Physician, or other Eligible Provider;
(4) provided that there is not a less intensive or more appropriate place of service or diagnostic or treatment alternative that could have been used in lieu of the place of service or service or supply given; and
(5) not Educational, Investigational/ Experimental, obsolete or done primarily for research.

Medical Plan § 1.3, *Medically Necessary* (A).

Subsection (D) of the definition of Medically Necessary provides:

> In the event an individual's claim for services
> or supplies for . . . speech therapy . . .
> for a Plan Year reach $2,000.00, the Claims
> Administrator or its delegate may automatically
> perform a review of the diagnosis and treatment
> of the patient's condition to determine whether
> the services or supplies are Covered Expenses
> which are Medically Necessary.

This provision was the basis for instituting the Medical Necessity review. Prior to 2004, benefits would continue to be paid until the review was completed. As of 2004, benefit payments would be discontinued until it was determined that the services were medically necessary.

Plaintiff contends the denial was arbitrary and capricious because the Plan does not specifically set forth the medical documentation that is required to support a claim. Plaintiff contends that the letter from Dr. Forsey-Koukol and the fax from Ricamato should have been sufficient documentation and that requiring further documentation is adding a requirement that is not contained in the Plan. Defendants contend the decision was not arbitrary in that they were seeking information about the etiology of the apraxia in order to determine whether coverage was excluded under § 8.1(A)(21) of the Medical Plan in that the

apraxia was not caused by disease, trauma, or a congenital
anomaly or it was related to a developmental delay.

Although the consideration of further benefits was begun
as a medical necessity review, the review also considered whether
the speech therapy was caused by a condition that was not
excluded from coverage under the Medical Plan. That was a
reasonable development; the Administrator should not be required
to ignore information indicating that an exclusion might apply.
The first determination after medical records were submitted (the
May 19 Determination) denied coverage on the ground that
treatment for psychosocial speech delay, behavioral problems,
attention disorder, conceptual handicap, or mental retardation
was excluded. The final administrative decision (the July 19
Determination), however, stated there was insufficient proof of
medical necessity, but suggested submitting further information,
including information regarding the medical conditions that
caused the "speech apraxia or speech delay." Although defendants
still make reference to medical necessity, their actual argument
(which is somewhat consistent with the July 19 request for
additional information) is that coverage is excluded under
§ 8.1(a)(21) of the Medical Plan. That provision excludes
coverage "for speech therapy that does not actively treat a
speech impairment resulting from disease, trauma, congenital
anomaly or previous therapeutic process." Stated positively,

coverage is provided for a speech impairment resulting from
disease, trauma, congenital anomaly, or therapeutic process.
There is no indication of a prior therapeutic process causing the
need for speech therapy and the speech therapist's report
expressly states that no injuries have been identified or
sustained. Given the young age at which the speech problems
appeared, congenital anomaly is a possibility, but no medical
evidence has been submitted to support such a cause. That leaves
disease as the one remaining possibility.

There is no dispute that the medical records support that
Emily has apraxia. The Medical Policy Guidelines define apraxia
as a "disorder resulting from cortical damage, affecting the
ability to voluntarily control motor programming. There is no
associated weakness." Medical Policy THE803.014 (March 1, 2000)
(reproduced as Def. Exh. 4, Tab 2 at 249). The Medical Plan does
not define the term "disease." A Medical Dictionary defines
"disease" as: "an impairment of the normal state of the living
animal or plant body or one of its parts that interrupts or
modifies the performance of the vital functions, is typically
manifested by distinguishing signs and symptoms, and is a
response to environmental factors (as malnutrition, industrial
hazards, or climate), to specific infective agents (as worms,
bacteria, or viruses), to inherent defects of the organism (as
genetic anomalies), or to combinations of these factors."

Merriam-Webster Medical Dictionary (2005) available at
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=
disease. That same medical dictionary defines "disorder" as:
"an abnormal physical or mental condition." Id. available at
http://www2.merriam-webster.com/cgi-bin/mwmednlm. It defines
"apraxia" as: "loss or impairment of the ability to execute
complex coordinated movements without muscular or sensory
impairment." Id. available at http://www2.merriam-webster.com/
cgi-bin/mwmednlm?book=Medical&va=apraxia.

Contrary to plaintiff's contention, the Claims
Administrator may make reasonable requests for adequate
documentation. Allison v. Unum Life Insurance Co. Of America,
381 F.3d 1015, 1924 (10th Cir. 2004); DeBartolo v. Blue Cross
Blue Shield of Illinois, 375 F. Supp. 2d 710, 713-14 (N.D. Ill.
2005). The medical documentation that had been submitted
contained limited information regarding the causes of plaintiff's
apraxia. Assuming the origination of the apraxia was a pertinent
inquiry, it was not unreasonable to request additional
information on the subject. The focus of defendants' present
argument is on the cause of the apraxia and that apparently was a
focus of the administrative inquiry as well. However, the
exclusion refers to the "speech impairment" itself resulting from
disease. Neither the administrative determinations nor
defendants' present arguments address the question of what

qualifies as a disease under the Medical Plan. Defendants do not question that Emily has apraxia. If apraxia falls within the meaning of "disease" as used in the exclusion, then the record supports that Emily had a speech impairment resulting from the disease of apraxia. Since the Claims Administrator never considered this issue, the denial of benefits cannot be upheld based on the speech impairment not being caused by disease.

Defendants also contend that it was proper to discontinue coverage because it was possible that a developmental delay exclusion applied and neither plaintiff nor the providers submitted documentation to determine whether Emily's speech impairment was or was not a developmental delay. The exclusion relied upon reads in full:

> (A)  In addition to the limitations under Section
> 6.3 and Section 6.4, no payment will be made
> under the Medical PPO Option provision of the
> Plan for expenses incurred by an Employee or a
> Dependent:
> \* \* \*
> (21) for speech therapy that [a] does not
> actively treat a speech impairment resulting from
> disease, trauma, congenital anomaly or previous
> therapeutic process, or [b] treats a swallowing
> disorder, non-restorative conditions such as
> developmental delays, or [c] that is not likely
> to result in a significant improvement of the
> condition being treated;
> \* \* \*

Medical Plan § 8.1(A)(21).

In subsection (21), there are three phrases separated by the disjunctive "or" which have been labeled [a], [b], and [c].[4] The syntax of the sentence is improper: a "that" appears at the beginning modifying all three phrases, but a "that" is again repeated in phrase [c]. Thus, phrase [c] improperly reads "for speech therapy that . . . that is not likely to result in a significant improvement of the condition being treated."[5] There is also a missing connector for the clause "non-restorative conditions such as developmental delays" that is contained in phrase [b]. Given the manner in which the ors divide subsection (21) into three phrases, the developmental delays clause appears to modify "swallowing disorder," though the pluralization of "conditions" and "delays" is out of syntax with "swallowing disorder" being singular. But if the developmental delay clause is not a modifier of swallowing disorder, swallowing disorder is a phrase by itself and the Medical Plan would have to be read as excluding coverage for all swallowing disorder speech therapy. The Medical Policy Guidelines, however, do not construe the Medical Plan as excluding coverage for all swallowing disorders.

---

[4]The bracketed [a], [b], and [c] are not in the original. They have been inserted for discussion purposes only.

[5]Alternatively, phrase [a] could start with "that." But then phrases [a] and [c] would have a "that" and phrase [b] would not. Phrase [b] would then read "for speech therapy . . . treats a swallowing disorder, non-restorative conditions such as developmental delays."

Policy THE803.014 provides that speech therapy coverage is
available for swallowing disorders that are "due to disease,
trauma, congenital anomalies, or prior therapeutic intervention."
There is no express mention in the Policy Guidelines regarding
developmental disabilities. However, as previously indicated,
correcting the syntax, grammatical, or clerical problems of
subsection (21) by separating the swallowing disorder clause from
the developmental delays clause would leave the only possible
reading of subsection (21) as excluding coverage for all
swallowing disorder speech therapy, which would be inconsistent
with the Policy Guidelines. The only way to construe subsection
(21) and the Policy Guidelines consistently is to read
developmental delays as modifying swallowing disorders. Thus,
the speech therapy services for swallowing disorders that are
excluded by phrase [b] are services for swallowing disorders
caused by developmental delays. Since developmental delays
modifies swallowing disorders, subsection (21) does not contain a
general exclusion for all speech therapy resulting from
developmental delays.

        Under ERISA, when a plan administrator has discretion to
construe plan language, the usual rule that ambiguous language is
construed against the insurer (contra proferentem) does not
apply.  Hess v. Reg-Ellen Machine Tool Corp., 423 F.3d 653, 662
(7th Cir. 2005). As discussed above, though, the Policy

Guidelines have already resolved the pertinent ambiguity in
§ 8.1(A)(21). Defendants rely on the Policy Guidelines as
controlling interpretations of the Medical Plan. Therefore, it
would be an abuse of discretion for the Claims Administrator to
act inconsistently with the Policy Guidelines. Moreover, there
is no indication that the Claims Administrator actually
recognized the ambiguities in § 8.1(A)(21) and attempted to
resolve them. The May 19 Determination stated that speech
therapy for "psychosocial speech delay, behavioral problems,
attention disorder, conceptual handicap or mental retardation" is
excluded. That does not appear to be a decision based on
§ 8.1(A)(21). More importantly, the July 19 denial was not based
on Emily's speech therapy being excluded because related to a
developmental delay; it was based on a purported failure to show
medical necessity. The July 19 determination did suggest
submitting additional "medical information about any medical
conditions that may have caused or contributed to the member's
speech apraxia or speech delay." That does not imply that
services for a speech delay are excluded services. Neither would
it have made clear to plaintiff or the service providers that it
was necessary to submit medical evidence showing that Emily's
speech impairment did not result from a developmental delay. For
the foregoing reasons, a denial based on a developmental delay
exclusion would have been an abuse of discretion.

To the extent the Claims Administrator denied coverage for Emily based on a developmental delay exclusion, such a denial was an abuse of discretion because inconsistent with the terms of the Plan. Even if the Plan could reasonably be construed as containing an exclusion for speech therapy services provided for a speech impairment resulting from a developmental delay, the Claims Administrator abused its discretion by failing to request that plaintiff submit medical documentation showing that Emily's speech impairment was not caused by a developmental delay. The Claims Administrator also abused its discretion by failing to consider whether, under the terms of the Medical Plan, the apraxia that was found to exist was a "disease" causing Emily's speech impairment. While a full and proper resolution of that issue might have resulted in a proper denial of benefits, the present posture of the case requires that Emily's coverage be reinstated effective March 1, 2004. If a subsequent review properly determines that benefits should be discontinued, any new determination would be prospective based on when that review was instituted. Under Seventh Circuit precedents, when existing benefits are improperly discontinued, benefits are to be reinstated; there is no remand for reconsideration of the prior decision. Schneider v. Sentry Group Long Term Disability Plan, 422 F.3d 621, 629-30 (7th Cir. 2005).

IT IS THEREFORE ORDERED that minor plaintiffs Michael Bails and Emily Bails are dismissed from this case without prejudice as improper parties. Defendants' motion for summary judgment [24] is denied. Plaintiff's motion for summary judgment [31] is granted. The Clerk of the Court is directed to enter judgment in favor of plaintiff Patrick Bails and against defendants reinstating speech therapy benefits related to Michael Bails effective February 16, 2004 and related to Emily Bails effective March 1, 2004.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED: JULY ( ( , 2006